BEATTIE *v.* HILLIARD.

It is a gross misconduct for a person who has formed and expressed an
opinion on the case, to accept the office of arbitrator without informing
the parties of the fact.

It is sufficient reason for admitting secondary evidence that the original
paper is beyond the jurisdiction of the court.

BILL IN EQUITY, to set aside the award of John W. Barney, Benjamin
F. Hunking, and Edward R. Kent, arbitrators agreed upon by these par-
ties to determine concerning the claims of each against the other for
damages sustained by each in an affray and assault, May 18, 1868.

The bill alleges that " the arbitrators were biased and committed in
favor of the defendant and his case, and prejudiced and hostile to
the plaintiff and his case, and were partial and interested in behalf of
said defendant, and unfit men to serve as arbitrators between the par-
ties touching the matters aforesaid, * * all which the defendant
well knew, but concealed his knowledge ; * * that said arbi-
trators did knowingly and fraudulently enter upon said trust, with the
knowledge and connivance of the defendant, intending to injure and
defraud the plaintiff; * * that the award is exorbitant, excessive,
fraudulent, and unwarrantable."

The answer is a specific denial of these charges, to which there is a
general replication.

The cause was tried before FOSTER, J., at the April term, 1874, of
the supreme judicial court.

Under the direction of the court, the following issues were framed
and submitted to the jury :

I. Were the said arbitrators [or either of them] biased or committed
in favor of the said George Hilliard and his cause ?

II. Were the said arbitrators [or either of them] prejudiced or hostile
to the said Alexander M. Beattie and his cause.

III. Were the said arbitrators [or either of them] partial to the de-
fendant and his cause, by reason of any interest of the said arbitrators,
or either of them, in the result of said arbitration ?

IV. Was the said award exorbitant or excessive ?

V. Was the said award fraudulent ?

In the summing up by the court, the presiding judge said,—" It is
no cause for setting aside an award, that a person, finally agreed upon
as an arbitrator, has at some time formed and expressed an opinion
concerning the case, if he was impartial at the time of the hearing.    In
a case naturally or inevitably creating great excitement, everybody
talks about it, hears about it, reads about it, and gets an impression
about it.    First reports are generally exaggerated.    Usually one side
is heard first.    At last it turns out that the facts are not so bad as re-
ported.    The other side is heard, opinions become modified, changed,

reversed. The question is, whether an arbitrator, at the time of his official and judicial action, is impartial, and free from prejudice or bias. Strict impartiality is required. A person who accepts the office of an arbitrator should approach his duty with clean hands and a pure heart. If he has heard the case talked about, and if he has formed an opinion, he ought not to sit as an arbitrator unless he feels that he can divest and has divested himself of all prejudice or bias. If he does not fulfil these conditions it is misconduct on his part, and if it is serious, it will avail to set aside the award. During the progress of an arbitration, it would be very improper, and strong evidence of corruption and misconduct, for an arbitrator to talk with a party, or his friends, or anybody else, about the merits of the cause. It is better, indeed, that an arbitrator, during the progress of an arbitration, should not even talk with either of the parties about anything (though an arbitrator might doubtless very innocently do this); and the fact that an arbitrator is seen talking with a party to the cause is evidence of fraud, but, taken alone, would not probably have great weight. If an arbitrator at the time of the hearing has any pecuniary interest in the result, this fact is conclusive evidence of such misconduct as amounts to fraud. The pecuniary relations of a party to an arbitrator may be examined, and the fact that a party, in whose favor the award is, is indebted to the arbitrator, is evidence on the question of fraud. It by no means follows that an arbitrator is fraudulent simply because he is a creditor of the party prevailing. The weight of the evidence on this point may depend upon many circumstances,—the amount of indebtedness, the solvency or otherwise of the debtor, the extent and value of the creditor's security, &c. If the debt is small, or abundantly secured, evidence of fraud or of interest in the result would be slight. If the arbitrator in fact has an interest in the award, that is, a pledge of it, before or after the award is made, that fact is evidence of gross partiality, fraud, and corruption." To these instructions the plaintiff excepted.

With reference to the first and second issues presented to the jury, the court instructed them that "the burden of proof was upon the plaintiff, to make out, by a fair balance of evidence, that the arbitrators, or one of them, at the time of the hearing, were biased or committed in favor of the defendant and his cause, or were prejudiced or hostile to the plaintiff and his cause;" to which instructions the plaintiff excepted.

The plaintiff's counsel requested the court to give the following instruction: "If the arbitrators had been prejudiced and biased in favor of the defendant and against the plaintiff, and had so expressed themselves, the presumption is that they continued so to the time of the arbitration; and the burden of proof is upon the defendant in that event to show that the arbitrators had become impartial." The court refused to give the instruction, and the plaintiff's counsel excepted.

No exceptions were taken to the instructions of the court, which related to the third issue. The jury returned a negative answer to each of said issues. The plaintiff's counsel seasonably moved that the

verdict be set aside as being against the evidence, and also because of the misconduct of certain jurors during the trial, and because certain jurors were partial and prejudiced against said Beattie, and had formed and expressed an opinion on the merits of the cause, in Hilliard's favor, before the trial began.

Certain exceptions were taken by the plaintiff to the rulings of the judge upon questions raised upon the evidence of Edward Savage, Edward R. Kent, Dr. Barney, Alexander M. Beattie, and the deposition of Leander Davis.

These exceptions were reserved.

Alexander M. Beattie, the plaintiff, testified that just before the sitting of the November term of court, in 1868, "I came from Montpelier, Vt., to Lancaster, N. H. Mr. Wallace W. Lindsey came to me, at Lancaster, and made a proposition for a reference of the case between me and the defendant. I said I was willing if we could agree upon fair and impartial men, and proposed the names of Judge Poland and Harry Hibbard. Lindsey went and saw Hilliard, and returned saying that Hilliard didn't know those men, and would not agree to them, but that he proposed to leave our matters out to Dr. J. W. Barney, B. F. Hunking, and Edward R. Kent, of Lancaster. I said I rather have somebody out of Lancaster; but, upon Mr. Lindsey assuring me that they were fair and impartial men, I agreed to them, and signed the papers. I had no knowledge or belief that these men were biased or prejudiced against me; did not know that they had taken any part or interest in the matter; supposed that they were fair and impartial men, and heard nothing to the contrary before the arbitration. I had no particular or intimate acquaintance with Lancaster men; had speaking acquaintance with Barney and Kent. Had lived in Lancaster only one week before the affray, and then lived two miles from the village. The hearing was had in the town hall in Lancaster, beginning December 14th, 1868. At an intermission during the trial before the arbitrators, I noticed Edward R. Kent sitting between the defendant and his brother, Henry S. Hilliard, on one of the benches in the north end of the town hall. None but these three were together, and they were talking and laughing. I found them in this situation when I went into the hall after dinner.

In regard to the arbitrator Kent, the plaintiff called (1) Charles E. Benton, who testified as follows: " Know E. R. Kent. Had talk with him a few days after the affray in Kent's store. He gave me an account of it; said plaintiff was to blame. He appeared to be earnest and decided, and said that the plaintiff was wholly in the wrong and defendant in the right; that defendant was justified in doing as much as he did after plaintiff became senseless—in kicking him after he was down—as plaintiff was the aggressor; that defendant was justified in all he did. This talk with Kent was within a few days after the affray. My wife was present. Plaintiff had not been removed to his home in Brunswick, Vt. Kent said he had been to see defendant, and had talked with him about the matter. Think he said he had talked with him about the affray."

(2) Deposition of Mrs. C. E. Benton : " In Kent's store soon after the affray. I heard E. R. Kent tell my husband that he blamed Beattie in regard to it. He said that Hilliard would have. been justified if he had killed Beattie. Kent appeared excited and interested. He *did not* say that Hilliard would have been justified in killing Beattie if what he had heard was true."

(3) George M. Stevens testified that " In the fall of 1868, the latter part of November, about Thanksgiving time, E. R. Kent asked me into his counting-room, and said that the case between these parties was to be arbitrated ; that Dr. Barney, B. F. Hunking, and himself had been selected as arbitrators ; that Hunking could not attend, and they wanted some one in his place, and had talked of me. I told him I didn't understand such matters, and wasn't a suitable person to act in that capacity. Kent said he thought I was ; that it was an easy matter to decide ; that every one knew that plaintiff was a quarrelsome, ugly fellow, and that the defendant was a quiet, peaceable man ; that the affray was a great outrage on the part of the plaintiff, and he ought to pay well for it."

In regard to the arbitrator, Dr. Barney, the plaintiff called (1) Mrs. Ellen Fling, who testified as follows : "Lived at the American house, in Lancaster, N. H., in May, 1868. Saw Dr. Barney in the kitchen same evening after affray ; he had been dressing defendant's wound ; had his instruments with him ; he came into kitchen to wash them. He said Hilliard would have been justified if he had killed Beattie ; seemed decided in his feelings about the matter."

(2) Freedom D. Beede testified : " I was one of the Lancaster police in May, 1868 ; was at hotel after affray was ended ; went to both Hilliard's and Beattie's rooms ; saw Dr. Barney there dressing Hilliard's wound. I remarked to him that Beattie was badly hurt. The doctor seemed excited, and replied,—' Not so bad as he ought to have been ;' that ' Hilliard ought to have killed Beattie.' Had a conversation with Dr. Barney and Wallace Lindsey, in the spring after the award, at the latter's farm on the river. Barney came along ; Lindsey took out a stallion that had belonged to Hilliard, and which had been pledged to Lindsey as security for a debt Hilliard owed him. Dr. Barney said,—' I advised Hilliard to take the $1,000 that Thomas Beattie offered him to settle the award, and then he could have paid us [Lindsey and Barney] what he owes us.' Lindsey said,—' I advised Hilliard the same.' At the time of the award the defendant was not considered worth much ; don't know who defendant owed except by hearsay ; Dr. Barney told me Hilliard's horses were mortgaged to him."

(3) Bracket G. Corser testified that " August 6, 1868, I had talk with Dr. B., at Lancaster house, about affray ; asked him which he considered most to blame ; he said he considered Capt. Beattie most to. blame ; that he was the man that picked the quarrel ; he said that Capt. B. ought to be made to pay for injuring Hilliard ; that he had committed a great outrage upon Hilliard, and no doubt he would have

to pay for it.  He seemed to be so much prejudiced against Beattie that I made no further inquiries of him about the matter.   Some time after the arbitration I saw Dr. B. at St. Johnsbury; had heard the amount of the award, and understood Dr. B. was one of the arbitrators. I asked him if they did not make Beattie pay pretty heavily; he said 'We intended to make him pay well for it, and I guess it is all right that he should.'"

(4) Frank Smith testified that soon after seeing an account of the affray between the parties in the newspapers, in May or June, 1868, "Dr. Barney and William Burns, Esq., called on me in Boston, and, upon my inquiry, the doctor gave me a description of the affray, and I think he said Beattie was not hurt as bad as he ought to have been. I did not understand that Dr. B. saw the affray.  He told me about attending upon Hilliard, and described his injury."

(5) Edward Savage, telegraphic operator at Lancaster, testified,—" I sent on the wires to Concord an account of the affray, next morning after it occurred, to correspondent of *Boston Journal;* saw it afterwards in the *Journal.*   I wrote the account sent at the dictation of Dr. Barney.  The excitement here was very great at that time.  By order of the telegraph company, I keep all original messages three years, and then send them to New York.   I suppose I sent this message to New York, because it was my custom to send them after the lapse of three years.   I have not got what I wrote down at the doctor's dictation."

The plaintiff offered to show by parol the contents of the message dictated by Dr. Barney, giving an account of the affray, and the contents of the same as printed in the *Boston Journal* (a copy whereof is annexed and marked); but the same upon objection by the defendant was ruled out.   The plaintiff excepted.   The plaintiff further offered to show that pursuant to a general rule or regulation of the telegraph company, as contained in the "book of rules" or in the "journal of the telegraph," published by the telegraph company, which are furnished to every operator, all dispatches kept three years and then sent to New York, as stated by Mr. Savage, are, after being kept there one year, destroyed.   Upon the defendant's objection, the court rejected the evidence offered, and the plaintiff excepted.   Upon cross-examination, Mr. Savage stated,—" I think it was Dr. Barney who dictated my dispatch ; am pretty sure of it, but not certain."

(6) Deposition of Leander Davis.   Subject to the plaintiff's exception, the defendant's counsel were allowed to ask one of the arbitrators the following question : "How did the balance of the evidence strike your mind at the hearing before the arbitrators; and what was your idea of the evidence offered before the arbitrators as to which party was the aggressor; and what did it all tend to show ?"

*Ans.*  "The evidence all went to show that the plaintiff was the aggressor, except the testimony of Beattie ; the testimony of Hilliard and four witnesses established that Beattie was the aggressor.  We thought that defendant was wholly justified, and acted in self-defence, on the ground that Beattie was striking at him."

The defendant's counsel asked a witness—one of the arbitrators— the following question, to which the plaintiff objected. The court ruled that the question and answer were competent evidence for the jury to consider; exception by the plaintiff. "Upon hearing the whole evidence before the arbitrators, who appeared to be the aggressor, and who did you think was most to blame at the time when the affray took place?"

*Ans.* "After hearing the whole evidence, we thought Beattie was the aggressor, and most to blame, and made our award with reference to it."

The deposition of Davis was not furnished with the case. The affidavits of sundry witnesses, in regard to the misconduct of the jurymen, were laid before the court.

*Ray & Drew, G. A. Bingham,* and *J. Benton,* for the plaintiff.

*Burns & Heywood* and *Fletcher & Heywood,* for the defendant.

\*CUSHING, C. J. The evidence in this case tends to show that the plaintiff Beattie had little or no acquaintance with the arbitrators before the agreement to refer was made, and that he did not know that either of the arbitrators had formed or expressed any opinions unfavorable to him, or that they were not entirely impartial and indifferent persons.

The evidence of the plaintiff tends to show that the arbitrator Kent had previously formed and expressed opinions very unfavorable to the plaintiff, and also that the arbitrator Barney had done the same thing.

The evidence also tends to show these persons were on friendly terms with the defendant Hilliard, and that they were unfriendly to the plaintiff Beattie.

It is almost if not entirely certain that if the plaintiff had known how these arbitrators had felt and had expressed themselves with regard to himself and his cause, he would never have consented to refer the controversy to them.

The evidence also tends to show that Mr. Lindsay, who acted as go-between in the negotiation, represented that they were fair and impartial men.

It appears to me that if this were true, as the evidence certainly tended to show, these arbitrators were instrumental in practising a fraud upon the plaintiff, and inducing him to agree to an arbitration which he never would have agreed to if they had told him frankly how they felt and what they said, if the plaintiff's evidence was correct. Of course, we do not assume here to find as matter of fact anything one way or the other. What is necessary for the court to know is, that there was evidence laid before the jury, which, if believed by them, would establish the facts.

---

\*LADD, J., having been of counsel, did not sit. FOSTER, C. J., C. C., having presided at the trial at *nisi prius,* did not sit.

The court instructed the jury that it was no cause for setting aside an award, that a person finally agreed upon as an arbitrator has at some time formed and expressed an opinion concerning the case, if he was impartial at the time of the hearing.

I think that this instruction and that which accompanied it were calculated to mislead the jury; to make them believe that it was quite in the ordinary course of things, and naturally to be expected, that all this would happen, and that persons who had formed and expressed strong opinions might naturally be expected to be impartial. The jury ought to have been instructed that if the referees had formed and expressed a decided opinion, and then accepted the office of arbitrator without notifying the party of the facts, it would have been great misconduct on their part, and such as would furnish strong evidence that they were not impartial, and that their statements to the effect that they were must be received with great caution.

The practice of arbitrations is most beneficial. When the arbitrators have been fairly chosen and agreed upon, when there has been nothing in their conduct or in their speech which, if known to either of the parties, would destroy or weaken his confidence in them, the award is apt to command respect, and in the end to be satisfactory. Under such circumstances, courts are always disposed to treat with great indulgence the errors and shortcomings of referees, provided that they start with the essential qualities of fairness and impartiality. Arbitrators are liable to do a great many things which, in men trained to legal investigations, would be, and would be thought to be, wrong. They are liable to make mistakes of law, and mistakes of fact. But if, using their best judgment—not undertaking to be learned or technical—not professing to settle the law any further than what they think it ought to be for that particular case—they make an honest and intelligent award, embracing the matter submitted to them, and nothing else, courts are apt to maintain such awards, notwithstanding errors and informalities not inconsistent with integrity, and not prejudicial to the fairness of the trial.

Awards being thus so conclusive in their nature, it is necessary that those who undertake the office of arbitrators should practise the utmost sincerity, candor, and fair dealing. There should be nothing which, coming to the knowledge of either party after the award, would give him reason to believe that he had been deceived or wronged.

Now, it seems to me that it would be a grave misconduct for a person who had formed and expressed a decided opinion,—one so decided as the plaintiff's evidence in this case tends to show had been formed and expressed by the arbitrators Kent and Barney,—to undertake the office without fully acquainting the party with these facts. If, knowing the facts, the party still agrees to the arbitrator, he has no cause of complaint; but he ought to be permitted to know them.

In the case of *Wiggin* v. *Plumer*, 31 N. H. 272, Judge BELL, speaking of a juror similarly circumstanced, used this language: "Mr. Coffin doubtless supposed that, notwithstanding what he had heard and

said, he could hear the evidence without bias, and render an impartial decision; but experience does not confirm the soundness of that opinion." The case of a juror is very analogous to that of an arbitrator; but the arbitrator's power is so much greater, his proceedings are so much less liable to be under the supervision and care of experienced men, and the effect of an award is so great, that, if possible, greater watchfulness and greater care should be used in the case of arbitrators than in the case of jurors.

For these reasons, I think, the verdict should not stand.

Evidence has also been laid before the court tending to show misconduct in two of the jurymen. It appears to me that this case is also made out. The evidence certainly makes it extremely probable that at least two of the jurymen had formed and expressed opinions unfavorable to the plaintiff. They were, also, when not engaged on the trial, frequenting one or more stores, listening to the conversation which was going on, and sometimes taking a part in it; and it seems hardly possible that jurymen, so conducting, could continue to be impartial throughout the trial, even if they were so at the commencement.

Certain questions have been presented in regard to the exclusion or admission of testimony. The first question was in regard to the testimony of the telegraph operator, to lay a foundation for introducing the evidence of the copy of Barney's message. Ordinarily it is for the court to find the facts by which the absence of the original document is accounted for. If the court found, as matter of fact, that the original message had been sent to New York, and was beyond the reach of the process of the court, that would, according to my recollection of the practice, be a sufficient reason for admitting the copy. The same principle seems to apply in this case as in the case of subscribing witnesses to written instruments. It is enough to show that the subscribing witness is out of the jurisdiction, to excuse his absence.

The questions put to the arbitrators in regard to what they found seem to be simply immaterial. It is not apparent how they could do any harm or any good to anybody.

Although the errors in the charge relate only to the first, second, and fifth issues, yet, as the evidence in regard to the misconduct of jurymen relates equally to all, the verdicts on all the issues must be set aside.

SMITH, J. I am also of opinion that this verdict should be set aside. It may be conceded that the arbitrators endeavored to act honestly and impartially, and that they wholly persuaded themselves that they did so. The evidence tends to show that two of them at least had prejudged the case, and had on more than one occasion expressed their opinions. They cannot therefore be deemed impartial. If the plaintiff had been informed of their real position, he never would have consented to their sitting as arbitrators in his case. Next to securing a fair and impartial trial for parties, it is important that they should feel

that they have had such a trial; and anything that tends to impair their belief in this respect must seriously diminish their confidence and that of the public generally in the ability of the state to provide impartial tribunals for dispensing justice between its subjects. The views of Mr. Justice BELL, in *Wiggin* v. *Plumer*, 31 N. H. 272, upon this subject are eminently sound, and confirmed by general experience.

There is also evidence which tends to show that during the trial one or more of the jurors during the adjournments were present when the merits of the case were discussed, listening to and at times participating in the discussion, so that their minds, although perhaps insensibly, must have been influenced against the plaintiff. But however that may be, no party could be expected to rest satisfied with a verdict returned against him by jurors, some of whom had been subjected to such influences.

I think the parol evidence offered of the contents of the dispatch sent by telegraph should have been received.

In *Price* v. *The Earl of Torrington*, 1 Sm. Lead. Cases 139, Am. ed., 1847, are collected a large number of American decisions to the point, that, when entries are made in a shopkeeper's books of account by a clerk who is without the limits of the state at the time of the trial, in an action to recover for the goods so charged, the charges may be read in evidence upon proof of his handwriting, the same as if he were dead; and in *Dunbar* v. *Marden*, 31 N. H. 311, it was held, that, where a subscribing witness resides without the limits of the state, he is beyond the reach of the process of the court in the sense in which those words are used, and evidence of his handwriting may be produced in proof of the execution of the instrument;—see, also, 1 Gr. Ev., sec. 572. It appears that Savage wrote the account of this affray as dictated by Barney, and sent it over the wires to the *Boston Journal*, in which paper it was published. This message was kept by Savage three years in the office at Lancaster, and then, agreeably to his custom, sent to the office of the company in New York. The original memorandum was thus, at the time of the trial, if in existence at all, shown to be in the possession of the company in New York. It was beyond the custody or control of the witness, and beyond the reach of the process of the court. The facts as here presented would seem to fall within that class of exceptions to the rule requiring primary evidence, where the plaintiff was unable, " from physical or legal obstacles," to produce the original paper. The question presented is very similar to that decided in *Dunbar* v. *Marden, supra,* and, for the same reasons that governed the decision of that case, the foundation was laid for receiving secondary evidence of the contents of the paper.

I have nothing to add to what the chief justice has said upon the other questions presented in this case.

RAND, J., C. C. I have reached the conclusion, with considerable reluctance, that the verdict ought to be set aside in this case. I think that whenever a person is selected as an arbitrator in a cause in

which he has formed and expressed an opinion, he should state that fact to the party to whose prejudice the opinion has been thus formed and expressed; otherwise, the neglect should be regarded as misconduct sufficient to cause the award to be set aside.