By an order dated June 13, 1940, the Commission prescribed rates based on a valuation of the company's property of $435,000, on a 5 1/2% rate of return, and on estimates of receipts and charges which would yield the return. The company claims a higher valuation, a higher rate of return and a higher estimate of charges. *Page 283 
In its appeal it sets forth many specific claims of error in the Commission's findings of facts and rulings of law, as well as of failure to act upon requests for findings and rulings.
At the outset, the discretionary scope of action upon the appeal as authorized by the statute (P. L., c. 239, s. 18) has been considered. Differing from the laws in many jurisdictions which limit rights of appeal from the orders of administrative tribunals in rate cases to issues of law, the local statute provides that an order or decision of the Commission may be vacated not only for errors of law, but as well if "the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable" (P. L., c. 239, s. 11). Under certain circumstances new evidence in addition to that received by the Commission may be introduced (Ib., s. 12). The statute, in the measure of revisory power conferred by it, was construed in Grafton County c. Co. v. State,77 N.H. 490, 503-506, and the construction was impliedly adopted by the subsequent revision of the public laws in 1926, in which no change of language in the statute was made. The State's argument for a review giving more weight to the findings of the Commission than was considered the measure in that case is therefore more properly one to be addressed to the legislature than to the court. ". . . it is the conscience of the appellate tribunal which is invoked." Ib., 505.
As a corollary proposition, the discretion vested in the court in prescribing the scope and terms of a remanding order is its own. The statutory mandate is to furnish directions under which the Commission may do what justice may require. Unfortunately the Commission and the company are here charged by each with a provocative attitude against the other in the proceeding. The Commission asserts that the company has been uncooperative. Its report is alleged to bear internal evidence that impartiality has not been duly observed. It has ignored the company's requests for findings and requests so far as specific answer to them has not been made. The claim is advanced that the Commission has evolved a value and rate to produce a certain income, contrary to the rule that "the whole theory of rate regulation" bars the rate of profit as a consideration of value. (Grafton County c. Co. v. State, 77 N.H. 539, 543).
Without analysis of the evidence respecting the charges, it is enough to say that the company, with no attack on the integrity or competency of the Commission, lacks confidence in its sense of fairness in the proceeding, while the Commission, aware of the challenge of its judicial impartiality, may more or less naturally, if unconsciously, *Page 284 
be affected by it. It was said many years ago in Beattie v. Hilliard,55 N.H. 428, 435, 436, that "next to securing a fair and impartial trial for parties, it is important that they should feel that they have had such a trial." In pursuance of this policy of the law, it is thought that the ends of justice may be better accomplished by a full exercise of the revisory powers of the court. The special training, experience and skill of the Commission to deal with rate problems is given full recognition, but the proper conclusions from the evidence and the declaration of legal rules are here the matters chiefly in contention, so that on the whole, with all features of the situation considered, a recommitment to the Commission for further proceedings in the nature of a general new trial does not commend itself.
Moreover, "`If rate regulation is to be effective, there must come at some time an end of hearing and a decision of the questions involved.'" St. Joseph c. Co. v. United States, 298 U.S. 93. This is particularly true in view of the local statute (P. L., c. 238, s. 23) which limits the life of a rate order to a term not exceeding two years.
Upon the issue of value, it is elementary that it is one of fact, and that actual or historical cost and reproduction cost, with due regard for depreciation, are factors bearing importantly on value, neither cost being determinative as matter of law. The test that "The value of property is what it is worth in money, what it will bring in money to the seller or what it will cost the buyer in money to obtain it" (Grafton County c. Co. v. State, 78 N.H. 330, 334) has not changed as the legal rule.
It is not clear how the Commission arrived at the rate base of $435,000. But it is clear that they misinterpreted the statute relating to depreciation and took a view of the effect of depreciation contrary to law. In their report they advance the propositions, first, that the statute (P. L., c. 240, s. 11) impliedly forbids the use of a depreciation reserve for purposes of dividend declarations, and, second, that the customers may not justly be charged to pay a return on such part of value as has been created or maintained by money furnished by them.
In respect to the statute, its construction by the Commission is utterly indefensible. Its provisions (P. L., c. 240, ss. 9, 10, 11) require a utility to carry a "proper and adequate" depreciation account as the Commission may require and under its regulations, that the fund may be used for restorations or additions, or invested until such use with the income from it in invested form to be added to the fund, and that no dividends shall be paid "except out of net corporate income, *Page 285 
and except after setting aside" any required depreciation reserve.
While the statute requires income from the fund in an invested form to be added to the fund, it is silent as to any other limitation barring the utility from treating the fund like any other capital after its use for restorations or additions. The purpose of the statute is to secure the eventual use of the fund in rehabilitation and development of the plant; it is in the interest of the consuming public that service shall not be impaired, and the establishment of the fund and its use in such manner serves to maintain the plant in its integrity and to permit its enlargement to meet increased demand for its service. The statutory objective is thus accomplished, and the objective is further effected by control confining the source of dividends to net earnings after setting aside a proper reserve. Beyond this the statute in question does not undertake to make regulations affecting rates. It is not intended to operate as a restrictive test in the finding of just and reasonable rates in addition to its express terms. The statute for such rates (P. L., c. 238, s. 5) is under no implied control. The express bar to the payment of dividends from the income of the fund while it is in an invested form implies no bar beyond that. If a result of a bar of any return to the owners from the depreciation account after its use for restorations and additions had been the legislative purpose, it would have been expressed in general and sweeping terms. Clearly a limited bar covers only its limits.
The language in the statute prohibiting dividends except from net earnings and after setting aside the depreciation reserve means that the reserve shall be deducted from the gross earnings as an item chargeable against them before the net earnings are ascertained. This is understood to accord with the accounting system everywhere adopted in the bookkeeping of utilities.
To sustain the Commission's construction would be to hold that utility's system could earn money for its owners only on its depreciated value, which would become less as depreciation increased, with an eventual depreciation equal to the actual value. The confiscatory result of a system without earning value to the owners would thus ensue.
In respect to the effect of depreciation in arriving at a proper rate base, aside from statutory regulation, the Commission's report states that "unless the accrued reserve is deducted the real investment or equity of the owners will be overstated," and that ". . . it is difficult if not impossible, to justify any treatment which would force the customers to pay a return on the moneys which these customers *Page 286 
have contributed for the sole purpose of restoring intact the actual investment sacrifice of the utility."
This position is considered to be in conflict with the statutory enactment that rates shall be just and reasonable. While the issue of what is just and reasonable is one of fact, the requirement of balanced adjustment of the respective interests of owners and consumers as the test of what is just and reasonable is matter of A proper rate is one of yield from property without loss of investment. Carrying the Commission's position to its logical conclusion, an eventual entire loss of value for rate making purposes would occur, as already pointed out. The quoted statement suggests no qualification in avoidance of such a result. The Commission has found the depreciation charge proper and adequate. No inquiry has been made to analyze the use of the fund between restorations and additions.
The view that a proper and adequate depreciation reserve is an addition to capital seems contrary to fact. In definition, "Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy and obsolescence. Annual depreciation is the loss which takes place in a year. In determining reasonable rates for supplying public service, it is proper to include in the operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered." Lindheimer v. Company,292 U.S. 151, 167. It has otherwise been defined as "the loss in service value not restored by current maintenance and incurred in connection with the consumption or prospective retirement of property in the course of service from causes against which the carrier [or utility] is not protected by insurance, which are known to be in current operation, and whose effect can be forecast with a reasonable approach to accuracy" (177 Int. Com. Rep. 422).
The depreciation fund, if used for the purposes thus stated, adds nothing to capital investment, but only maintains it. The original plant continues intact, and at the end of any given period is in the same condition as at the commencement of the period, if the fund has been used to keep it thus maintained. In a fair, if not strictly accurate, distinction, the expense of ordinary repairs is charged to operating costs, while that of extraordinary repairs, including renewals, replacements and restorations, is met from the depreciation *Page 287 
account. Both kinds of repairs are necessary to keep the plant from running down, and to maintain efficiency. The public demand for efficient and continuous service calls for a standard of maintenance which will produce such service. The right of the owners of the utility that their investment shall not be impaired predicates the right of return from it on the basis of non-impairment. So far as it is impaired through service to the public, in justice the public should meet the expense of restoration. No fair reason can be given for saying that if the public should pay enough to give a fair return or income from the investment, they should not also pay enough to keep it maintained. The rule that property may yield a fair return assumes that the return is not gradually to diminish through lowering base rates. If the owners, instead of the consumers, paid the depreciation account without allowance for it in the rate of return, their investment would be increased by its amount, whether it was paid directly by them or taken from the net earnings figured without the allowance. The consumers paying, the investment is unchanged.
Whatever the difficulties of determining proper and adequate depreciation, whatever the difference in the methods of observed and pragmatic depreciation, whatever the merits between arithmetical and progressive depreciation, justice and reasonableness do not impose upon the owner any burden leading towards ultimate loss of value in respect to profitable use.
No question is presented here of excessive depreciation. The Commission has found the amount charged to be proper and adequate. While the statute permits the use of the fund for additions as well as for restorations, the finding implies that it has all been needed to avoid actual depreciation. So far as a reserve has proved excessive, the question is not presented. But even if it were, no good reason is perceived why it is not just that the utility investment should not receive treatment similar to an enterprise not subject to the utility law. The utility rates, and hence the earnings, are under control, but rates are fair if, without being excessive, they correspond with charges of enterprises having similar features. The owner of an apartment building is expected to charge rentals which will include some estimate for depreciation. The utility does not seem to stand differently in this aspect of comparison. The landlord's rent charge would not be found unreasonable on account of the depreciation item as one of its elements, if the item were not excessive. It is not unfair to the public that a utility enterprise should be in a parallel position. *Page 288 
The historical cost is $485,000. So far as cost measures value, the property is worth that figure. If the "net continuing investment," as the actual payments by the owners for the system, is $390,000, it follows that $95,000 has been taken from the depreciation reserve and used towards the historical cost. But it was needed in maintenance of the system, since no excessive depreciation reserve has accrued. It follows that money from a proper depreciation reserve has been used for proper depreciation purposes. In theory, not more property, but property maintained efficiently and without obsolescence, is the objective. If value is thereby increased, it is an incidental result. Maintenance, to be efficient in meeting the demands of those served, may reasonably be progressive as well as static. A plant, without enlargement, may require development in productive capacity and to conform to present day standards, as a matter of maintenance. The line between plant enlargement and maintenance may not always be readily drawn, but it lies in the field of facts and not of law. The expense of such maintenance is fairly chargeable to receipts from carrying on the business, instead of to capital. Being required to supply the demands of reasonable service, such maintenance is a part of the services, in final analysis, the expense of which the users of the service may fairly be required to pay. If no charge for depreciation were made against those whom the property serves, a plant inefficiently maintained would in time follow, unless the owners were required in some form of assessment, to pay the charge. If the payment were taken from net income, an inadequate return would follow. If it were paid direct by the owners, it would be new capital supplied only for maintenance. In either method of provision for it, an expense of service would fall upon the owners. They would thus be paying in part for the service received by the consumers.
The Commission's theory confuses cost and value. Value depends upon many factors. Even a physically well maintained plant may suffer loss in value, for reasons such as loss of business and mismanagement. A fair return is then not on cost or "net continuing investment," but only on the actual value at the time.
The continued use of property for a given purpose involves its continued adaptation for it. To keep it adapted is an essential element of furnishing service. It is a department of operation, and the charge for it, from the constitutional standpoint of ownership, is as proper an expense of operation as that of labor or taxes.
Moreover, from the constitutional standpoint, the "prudent *Page 289 
investment" theory, to which the Commission pay some tribute, is unsound. ". . . the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law." Minnesota Rate Cases, 230 U.S. 352, 454. The Commission has placed emphasis on the "net continuing investment" of the owners, as important, although not controlling, in arriving at the rate base. That the owners should be allowed nothing for actual growth of value, while suffering losses, is so contrary to the incidents of ownership as to conflict with constitutional principles. Regulation may not prescribe fixed and permanent values, and the rate base must be of present value of property properly and lawfully acquired, whatever its actual cost.
If the system were acquired by some municipality under eminent domain, it would pay the owners the fair value of the system, and the rate base ought to be no less. "When the property itself is taken by the exertion of the power of eminent domain, just compensation is its value at the time of the taking. So, where by legislation prescribing rates or charges the use of the property is taken, just compensation assured by these constitutional provisions [the fifth and fourteenth amendments of the federal Constitution] is a reasonable rate of return upon that value," West v. Company, 295 U.S. 662, 671, in which a measure of value of actual book costs less depreciation was held violative of due process. Even as to accumulated excessive depreciation, the consumers have no interest in it. "The revenue paid by the customers for service belongs to the company. The amount, if any, remaining after paying taxes and operating expenses, including the expense of depreciation is the company's compensation for the use of its property. If there is no return or if the amount is less than a reasonable return, the company must bear the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. . . . And the law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future. . . . [Citations omitted] Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in *Page 290 
the funds of the company. Property paid for out of moneys received for service belongs to the company, just as does that purchased out of proceeds of its bonds and stock." Board c. v. Company, 271 U.S. 23, 31, 32.
The company's accrued depreciation reserve, as a bookkeeping entry, is to be treated as an asset inuring to its benefit, by force of the state and federal constitutions. When property is taken for public use, fair payment for what is taken must be made, whether the property is taken over outright or whether its product in the form of service is taken. Any effect of excessive depreciation on rates is produced in determining a fair and reasonable rate of return not less than a non-confiscatory level, without reduction of the rate base.
The company's claim of value for the intangible element of goodwill or standing as a going concern in addition to property value is disallowed. The property value, whether based on actual cost or reproductive cost net, or with both costs given weight, assumes a demand for the use of the property, without which it would have only salvage value. As the Commission's report sets forth: "Attempts to justify going concern value as a separate item run into a maze of contradictions between theory and practice, between the growth of the actual plant and the dedication of the hypothetical plant to actual use." "The value of appellant's property used in stockyard services is single in substance. . . . While it may be considered as made up of tangible and intangible elements, it is not necessarily to be appraised by adding to cost figures attributable to mere physical plant something to cover the value of the business. . . . Value depends upon use and is measured, or at least significantly indicated, by the profitableness of present and prospective service rendered at rates that are just and reasonable as between the owner of and those served by the property. . . . [Citations omitted] It is elementary that value of a going concern may be less than, equal to, or more than, present cost of plant less depreciation plus necessary supplies and working capital." Denver c. Co. v. United States, 304 U.S. 470, 479. The evidence of such value here, separate from and in addition to plant value, is a conjectural estimate, arbitrary in character, and unentitled to adoption in any measure.
In respect to actual costs and depreciation, the evidence proves a cost of about $485,000 and a depreciation of about $103,000 found by the Commission to be proper and adequate and amounting to 21% of the cost.
In respect to reproduction cost, its purpose is to aid in throwing *Page 291 
light on value. It is relevant evidence bearing on value in the legal sense of value for sale or purchase. As greater or less than actual cost, it is evidence of bearing on present value. It may assume two forms of computation. One shows how a system parallel with the actual one would compare in its historical cost if present day costs had been expended in the construction of the actual system. The other shows what the actual system would cost at present day prices if it were constructed as a complete project in a single installation. The results of both methods are of service in determining the issue of value, although they may not coincide. The reproduction cost under either method being properly depreciated, a figure is reached which shows more or less approximately present value on the basis of present costs. The changes in costs in their aggregate equal the difference between historical and reproductive costs on the assumed basis of equality of management in constructing, developing and maintaining the system. Increases or decreases in property prices and construction expense may thus be comprehensively shown as evidence of greater or less present value.
It is said in Grafton County c. Co. v. State, 78 N.H. 330, 334: "What a new plant would cost would be of great importance to one proposing to purchase one in operation." No rule of law was thereby declared, and it was no more than an opinion dealing with the facts of the case. It was regarded in discretion as the best evidence. The difficulties and uncertainties in ascertaining reproduction costs of course vary in different cases. Many factors cannot be resolved by mathematical computation. Length of service, life of different component parts of the system, obsolescence resulting in doubtful availability of identical replacements, and changes in adaptability, may be mentioned as presenting problems of opinion. And experts may employ different methods of computation affecting their estimates. But it does not appear that the company's plant might not be reproduced with substantially the same type of construction and equipment which it now has. The different elements in the plant of a water utility, of water supply, pumping stations, rights of way, pipe lines, hydrants, service connections and equipment, and other structures, are more standardized through length of time than are some of the elements which go to make up the plant of an electric utility. If the estimates of experts vary, they are nevertheless to be considered, their relative weights passed upon, and a finding deduced in the same manner as opinion evidence in general is examined and appraised. *Page 292 
Three estimates of reproduction costs by experts have been made. Two of the experts were engaged by the Commission and one by the company. The Commission somewhat summarily dismissed from consideration the appraisal of Mr. Lord, one of its own experts. His qualifications were admitted, but at the time of the hearing he was dead, and because he could not be examined as a witness in explanation of the items of his report, the Commission discarded the report as having no evidentiary value aside from its service as an unappraised inventory. It is thought that the report did not receive due weight from the Commission. It was in evidence that his appraisals were made after thorough and painstaking search, inquiry and checks. He was competent. The Commission has found that the witness Clair "did not agree with the prices used," when Clair's testimony also was that he and Mr. Lord were in substantial agreement on prices. Moreover, the Lord appraisal was completed and submitted by Mr. Clair as an expert in the engineering firm engaged by the Commission for appraisal service. The circumstance that the Lord appraisal was made some three years before the others is of negligible consequence when allowance for plant additions during the period is made. The price level of materials and labor is not shown to have undergone any material change subsequent to the appraisal.
In some comparison of the experts' estimates, the cost estimate of Mr. Lord was $682,000. Thereafter the company incurred a capital expenditure of about $65,000, which would increase the estimate when brought to date and in line with the others, to $747,000. Mr. Morrison, the other expert hired by the Commission, estimated a reproduction cost of $675,000, while Mr. Newsom, the company's expert, arrived at a figure of $895,000. This figure included $50,000 as an item for intangible value, or value as a going concern, and over $100,000 as an item for "miscellaneous construction and equipment expense," understood to be largely an estimate for contractors' overlay and for overhead expense upon the basis of a newly constructed system as a unit, rather than of applying present prices to the existing system. If these two items, amounting to $150,000, are deducted, the result of $745,000 is in surprisingly close accord with the Lord adjusted estimate of $747,000. This virtual agreement not only strengthens the force of each of the two estimates but tends to lessen the value of the Morrison estimate. Aside from the two special items of the Newsom appraisal which have been mentioned and for which Morrison made no allowance, the chief difference in their estimates *Page 293 
is in the item of distribution mains and hydrants, the Newsom figure for the item being $50,000 higher than Morrison's.
There are thus the adjusted figures of $675,000 for the Morrison appraisal, $745,000 for Newsom's, and $747,000 for Lord's. Their allowances for depreciation are at wide variance. It would seem that the company's actual depreciation reserve, found by the Commission to be adequate and proper, should be applied in proportion to reproduction costs. The company has an allowed depreciation of 21% of actual cost. Applying this percentage to the foregoing figures for reproduction costs, the depreciations amount respectively and roundly to $142,000, $156,500 and $157,000, producing the reproduction cost net figures respectively and roundly of $533,000, $588,000 and $590,000.
The Commission has undertaken in extensive and elaborate analysis to show that the estimates of reproduction costs are too high. While avoiding any conclusion of a definite figure, they find, by necessary inference, that the lowest estimate of $675,000 is excessive. They have suggested various tests and checks pointing to that conclusion. Survey of the evidence and study of the Commission's report make it clear that the report is unduly critical. It is not deemed expedient that the various points and methods of bearing should here receive specific and detailed treatment. Many of them are based in measurable degree on opinion evidence, and the value of the evidence upon the items considered separately is differently appraised by the members of the court.
Without statement of the manner in which we have reached our conclusions, all of us are in agreement that while taking the findings of the Commission as prima facie correct, "it plainly appears 'beyond reasonable controversy'" (Grafton County c. Co. v. State, 77 N.H. 490, 509) that the reproduction cost of the company's system is at least $660,000. Assuming a depreciation of 21%, it results in a reproduction cost net of $521,400. But since, as already appears, the depreciation reserve is to be treated as an asset of the utility, a value of $660,000 remains if reproductive cost were to measure actual value. The actual cost of $485,000 is admitted. The present value, as the base rate, is $560,000, taking into account actual and reproductive costs, depreciation and other relevant evidence.
In respect to rate of return, "it is manifest that just compensation for a utility, requiring for efficient public service skillful and prudent management as well as use of the plant, and whose rates are subject to public regulation, is more than current interest on mere investment. *Page 294 
Sound business management requires that after paying all expenses of operation, setting aside the necessary sums for depreciation, payment of interest and reasonable dividends, there should still remain something to be passed to the surplus account; and a rate of return which does not admit of that being done is not sufficient to assure confidence in the financial soundness of the utility to maintain its credit and enable it to raise money necessary for the proper discharge of its public duties." United c. Co. v. West, 280 U.S. 234, 251, 252. "A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." Bluefield c. Co. v. Commission, 262 U.S. 679, 692, 693.
In Los Angeles c. Corp. v. Commission, 289 U.S. 287, 320, "the general situation as to investments" was held to be a factor of consideration, and "business conditions" were similarly taken into account in Dayton c. Co. v. Commission, 292 U.S. 290, 311. Judicial notice is taken of the downward trend and course of yield from invested property in its various forms, kind and character during the past ten years. In general the yield has been reduced from one-half to one-third. In other words, it takes from one and one-half to two times as much money to yield what the basic amount formerly did. In fairness, this widespread and unspecialized feature of investments should be recognized in the case of utilities as well as other enterprises. They are entitled to no exemption from the common lot. The company's financial condition is stable and sound, and with a surplus account, on the basis of the rate base of $560,000, of about $188,000, or an overlay of about one-third, its credit requirements for sustaining its needs of physical maintenance and service do not appear doubtful. Its "relations and opportunities" free its integrity *Page 295 
from danger of attack. The risks of fluctuations in its amount of business appear slight, while the risks of disasters and destruction are not impressive. The history from year to year has been of steady and continuous growth with minor exceptions.
Involved in the finding of a just rate of return is the effect of the different securities in the capital structure of the company. By economic principles and experience, income yield lessens with increasing security of capital. When there are, as here, mortgage bonds, preferred and common stocks, the amount of the mortgage lien represents an interest in the property equal to the amount. While not full ownership, yet the equity or interest of the stocks is measured in value by deducting the mortgage debt from the full value of the property mortgaged. In any enterprise whose property is encumbered with a mortgage debt, the interest on the debt is classified as an operating expense. In the case of a utility, good management requires reasonable economy in operation, and hence the hiring of money at no greater rates than the market offers. A reduction in interest rates, reducing the charges against receipts, would seem in justice and at least in some measure to inure to the benefit of the customers of the company. If the holders of common stock receive all the gain in net earnings resulting from the reduction, the consumers lose all benefit from the saving. Under the principle that fair rates are a balance of interest between owners and rate-payer, a less expensive service should spell a lower charge for it. While in technique the mortgage is but a lien on the property, and while, as usually phrased, the owners are entitled to a fair return from the use of the property, in reality there is an equity ownership, and not a full ownership, when the property is under lien. If the property were taken under eminent domain proceedings, the owners would be paid only the value of the equity interest. If the owners paid the mortgage debt, there would then be no interest charge, and they would then be entitled to a rate of return based on their full ownership. If, without any debt, a utility issued preferred and common stocks in equal amounts and sharing equally in liquidation, a low dividend rate for the preferred stock would not justify the holders of common stock to any claim of return based on the low rate for the preferred stock. Rates are established in social protection for the general welfare, and in keeping expense at its lowest point consistent with efficiency with a fair return on actual ownership interest, no confiscatory action is perceived.
". . . each utility presents an individual problem. The answer *Page 296 
does not lie alone in average yields of seemingly comparable securities. . . . Yields of preferred and common stocks are to be considered as well as those of the funded debt. When bonds and preferred stocks of well seasoned companies can be floated at low rates, the allowance of an over all rate return of a modest percentage will bring handsome yields to the common stock. Certainly the yields of the equity issues must be larger than that for the underlying securities." Driscoll v. Company, 307 U.S. 104, 119,120.
With due weight given to the foregoing and other points of pertinence, the rate of 5 1/2% found by the Commission as just and reasonable is not so clearly too low as to require the finding to be set aside. In analysis, the common stock, representing the equity ownership of all the surplus and of less than one-seventh in the remaining value of the plant, or a 42 1/2% ownership of the entire value, will receive over one-half of the expected net return, at a rate of 7% on such ownership.
The result imposes on the Commission the duty to recalculate the charges for water. In their estimate of receipts and expenses they should have the benefit of the company's report showing their actual amount in 1940.
In respect to rate case expense, the Commission recognizes it as a proper operating expense, but has declined to amortize it over a term of years. Also, it has made no charge for its own expenses in the case. This is a clear disregard of the statute (Laws 1931, c. 127, s. 1) which provides that its expense involved in an investigation "shall" be paid by the utility to an amount not over one-half of one per cent of the utility's existing valuation, to be charged to the utility's operating expenses and amortized over such period as the Commission shall fix. Upon the valuation as found, the utility is to be charged for such expense to an amount not over $2,800.
With reference to the company's own rate-case expense, the Commission assigns various reasons for denying its amortization. Among the reasons, excessive costs, some allocation to other matters, ability to pay and payment of all or a large part out of operating expense, and difficulty in determining a reasonable allowance, are given. These reasons are insufficient for the denial. Difficulty in performing the duty to determine what is just and reasonable is no relief from the duty. Excessive and improper charges may be found in amount as well as a fact. If unreasonably incurred, if undue in amount, if chargeable to other accounts, they may be to that extent reduced.
The present case was instituted in 1939, and is still pending. The company's expenses reasonably incurred in connection with it, including *Page 297 
those of the appeal, are to be ascertained. The Commission's statement that the 1939 expense of the company is a non-recurring item cannot be true either for 1940 or 1941, with the case being yet unconcluded.
Amortization for the expense is a demand of justice, to satisfy the principle of equalization. The company would be justified in spreading the expense over a reasonable term of years, instead of paying all of it in a part of the term, to the saving of operating expenses for the balance of the term. The effect of present payment is to reduce operating expenses in later years below a fair and proper level. The payment is for a service from which benefit in later years is derived. Fairly the customers are not entitled to the service without paying for it on a basis of adjustment which amortization is necessary to produce. A special operating expense ought not to be disregarded in the estimate of the receipts adequate over expenses to leave the amount of return called for by the rate. And its distribution through reasonable term is as fair to customer as to owner.
The rate term is not over two years (P. L., c. 238, s. 23), but investigations oftener than once in five years are not required (Laws 1931, c. 127, s. 2). In the lack of substantial evidence that another investigation will transpire within the quinquennial period, it should be employed as the only reasonable one to take for the amortization.
It is thought that the foregoing views of legal and factual issues are adequate in action upon the appeal. Specific treatment of the grounds of appeal beyond that given appears unnecessary. Many of the grounds become moot by reason of the discretion adopted in the extent of revision of the Commission's orders. The refusal of the Commission to discharge its duty "to find all facts which either party may request essential to the presentation of all questions of law raised by any decision or order made by them" (Grafton County c. Co. v. State, 77 N.H. 490, 498) may be noted. Answer to such requests is of benefit in the exercise of the revisory authority provided by the statute. Any fact taken into account, or which should be taken, in reaching the decision or order is essential, and performance of the duty is not excused on the ground that it is burdensome. It is evident that with such findings the exercise of the revisory power is facilitated and may, in discretion, be substantially narrowed.
The case is remanded for further proceedings pursuant to and consistent with this opinion.
Remanded.
All concurred. *Page 298 
ON MOTION FOR REHEARING. After the foregoing opinion was filed the State moved for a rehearing upon the relation of depreciation to value.